# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

In re Application of

ALASKA AIRLINES, INC.

Petitioner, for an Order Pursuant to
28 U.S.C. § 1782 to Conduct
Discovery for Use in a Foreign
Proceeding

No. _____

## MEMORANDUM OF LAW IN SUPPORT OF *EX PARTE*
## APPLICATION FOR AN ORDER TO CONDUCT
## DISCOVERY FOR USE IN A FOREIGN PROCEEDING

Dated: July 9, 2025

Sean Hecker*
John C. Quinn*
Hecker Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
shecker@heckerfink.com
jquinn@heckerfink.com

Aaron M. Danzig
Arnall Golden Gregory LLP
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363
(404) 873-8504
aaron.danzig@agg.com

Katherine Epstein*
Hecker Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(202) 742-2661
kepstein@heckerfink.com

*Counsel for Petitioner Alaska Airlines,
Inc.*

*Pro hac vice forthcoming*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND .................................................................................................. 5

ARGUMENT ..................................................................................................... 17

    I.    ALASKA'S APPLICATION SATISFIES 28 U.S.C. § 1782'S STATUTORY REQUIREMENTS. ............................................... 18

    II.   EACH DISCRETIONARY *INTEL* FACTOR SUPPORTS ALASKA'S APPLICATION. ............................................................. 20

CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

## CASES

*In re Application of Bracha Found.*,
    663 F. App'x 755 (11th Cir. 2016) ..................................................21

*In re Application of Compañía Anónima de Seguros la Occidental*,
    No. 15 Civ. 0012, 2015 WL 12862922 (N.D. Ga. May 13, 2015) .................19

*Application of Consorcio Ecuatoriano de Telecommunicaciones S.A. v. JAS Forwarding (USA), Inc.*,
    747 F.3d 1262 (11th Cir. 2014) ........................................................19

*In re Application of Travessia Securitizadora de Créditos Financeiros X S.A.*,
    No. 23 Misc. 67, 2023 WL 12066604 (N.D. Ga. Aug. 2, 2023) ............. 19, 23

*In re Clerici*,
    481 F.3d 1324 (11th Cir. 2007) ................................................ 17, 20

*El Poder del Consumidor v. Coca-Cola Co.*,
    No. 24 Civ. 03665, 2024 WL 5089428 (N.D. Ga. Oct. 30, 2024),.................22

*El Poder del Consumidor v. Coca-Cola Co.*,
    No. 24 Civ. 03665, 2025 WL 548273, (N.D. Ga. Feb. 19, 2025) ..................22

*In re England/Bahamas*,
    2021 WL 3270074 (S.D. Fla. July 30, 2021) ..................................21

*Glock v. Glock, Inc.*,
    797 F.3d 1002 (11th Cir. 2015) .......................................................21

*Gonzalaz v. Verfruco Foods, Inc.*,
    No. 21-12922, 2023 WL 1794391 (11th Cir. Feb 7. 2023) ...........................18

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004) .................................................................. *passim*

*In re Man Grp. Ltd.*,
    No. 24 Misc. 559, 2025 WL 294277 (S.D.N.Y. Jan. 24, 2025).......................21

*In re Novoship (UK) Ltd.*,
No. 20 Misc. 60876, 2020 WL 3286308 (S.D. Fla. June 18, 2020) ...............21

*In re O'Keeffe*,
660 F. App'x 873 (11th Cir. 2016)...................................................................22

*In re Sociedad Militar Seguro de Vida*,
985 F. Supp. 2d 1375 (N.D. Ga. 2013) ...................................................... 22, 23

*Weber v. Finker*,
554 F.3d 1379 (11th Cir. 2009)................................................................. 19, 22

## STATUTES

28 U.S.C. § 1782 ............................................................................ *passim*

49 U.S.C. § 40102 ....................................................................................5, 6

49 U.S.C. § 41102 ....................................................................................5, 6

## OTHER AUTHORITIES

Order 2006-12-23, Application of Virgin America Inc. for a Certificate of Public
Convenience and Necessity Under 49 U.S.C. § 41102 to Engage in
Interstate Schedules Air Transportation of Persons, Property, and Mail,
2006 WL 4504811 (D.O.T. 2006).......................................................................6

Order 2007-3-16, Application of Virgin America Inc. for a Certificate of Public
Convenience and Necessity Under 49 U.S.C. § 41102 to Engage in
Interstate Scheduled Air Transportation,
2007 WL 1280291 (D.O.T. 2007)..................................................................6, 7

Alaska Airlines, Inc. ("Alaska") respectfully submits this application under 28 U.S.C. § 1782 (the "Application") for an order: (a) granting Alaska leave to serve a subpoena (the "Subpoena") on Delta Air Lines, Inc. ("Delta"); (b) directing Delta to produce the materials described in the Subpoena within thirty days of service; and (c) directing Delta to provide corporate testimony on a mutually agreeable date within a reasonable time after Delta completes its production of documents.

## PRELIMINARY STATEMENT

This application arises in the context of a decade-long trans-Atlantic scheme that harms competition, flouts regulatory directives, and necessitates discovery of critical evidence uniquely in Delta's possession.

Alaska is in ongoing litigation with Virgin Group in the United Kingdom because Virgin Group is demanding more than two hundred million dollars from Alaska for the exclusive right (as determined by the English Court of Appeal) to use the Virgin trademark in the United States. But at the same time Virgin Group is enabling—indeed facilitating—the sale of domestic U.S. flights on Delta planes through the Virgin Atlantic website. So while Alaska is forced to pay for the right to use the brand, Virgin Group is using it to *harm* Alaska and benefit Alaska's key competitor, Delta. Evidence about that infringement—conducted by and through Delta—is at the center of the foreign breach of contract litigation between Alaska and Virgin Group. Section 1782 was designed precisely for circumstances like these.

The dispute between Virgin Group and Alaska stems from Alaska's parent company's acquisition of Virgin America in 2016. As part of that deal, Alaska inherited an exclusive right to use the Virgin America brand under a Trademark License Agreement (the "TMLA") between Virgin America and certain Virgin-affiliated companies (together, "Virgin Group"). The TMLA gave Virgin America, in the first instance, and Alaska, as the successor-in-interest, the exclusive license to use the Virgin and Virgin America marks in connection with airline operations over certain routes in the United States, as well as in Canada, Mexico, and the Caribbean.

The TMLA had been the subject of intense scrutiny and negotiation when Virgin Group first established a U.S. airline, Virgin America, in 2005. At that time, the U.S. Department of Transportation ("DOT") conditioned Virgin America's existence as a U.S. airline on the inclusion of a "no use, no royalty" provision in the TMLA. That is, DOT made clear that Virgin America needed to have the right to stop paying royalties if it stopped using the marks; otherwise, it would be too beholden to foreign interests. When Alaska then acquired Virgin America in 2016 and stepped into its shoes, it inherited the same deal.

In 2019, after Alaska invested considerable resources, effort, and money transitioning loyal Virgin America customers to the Alaska family, Alaska retired the Virgin America brand. At that point, Alaska stopped paying the ten million dollar minimum royalty to Virgin Group, on the understanding that if there was no use of

the Virgin brand, no royalty payments would need to be made. That understanding was based in significant part on the historical correspondence with DOT about that very issue. Virgin Group disagreed and commenced legal proceedings against Alaska, arguing that the right which was licensed to Alaska under the TMLA was the exclusive right to use the Virgin brand in relation to the licensed activities, including, crucially, the right to exclude others from using it (the "Minimum Royalty Litigation"). In light of that, Virgin argued that the minimum royalty was still payable by Alaska, even if it did not use the Virgin brand. As a result, Virgin Group contended, Alaska would owe ten million dollars per year until 2039, even though it was undisputed that Alaska was not using the Virgin America brand. Ultimately, the UK court agreed with Virgin Group's interpretation of the TMLA and found, in February 2023, that Alaska was required to pay the minimum royalty even when it did not use the Virgin brand because what it was paying for was the right to exclusivity.

Worse still, during the course of the Minimum Royalty Litigation, Alaska learned that another Virgin affiliate (this one focused on trans-Atlantic flights and aptly named Virgin Atlantic) together with Delta—which owns 49% of Virgin Atlantic and is also a joint venture partner with Virgin Atlantic—were infringing the exclusive rights for which Virgin Group was demanding the minimum royalty. Specifically, they were selling tickets on domestic Delta flights through the Virgin

3

Atlantic website. Step back and the scheme comes into focus: Alaska is being forced to pay ten million dollars a year so that its *competitors* can use the Virgin brand *to compete with Alaska*. And the critical evidence at the crux of the scheme—the acts of infringement, the harm they cause to Alaska, the unjust benefits they shower on Virgin Group and its partners—is right here in Atlanta. Indeed, the infringing flights are run on Delta's planes, and Delta, as both 49% owner of Virgin Atlantic and as its joint venture partner, is reaping the rewards.

In the English Proceedings in support of which this application is made (the "Breach Litigation"), Alaska contends that this material infringement repudiated (or in the alternative, Virgin Group renounced) the TMLA, resulting in termination, and thus extinguished whatever minimum royalties Virgin Group continues to demand, notwithstanding its own representations to DOT. By this application, Alaska seeks documents and corporate testimony from Delta. There can be no question that Delta possesses key information relevant to the Breach Litigation, including when the infringement began, the role of various Virgin Group companies in it, the scale of the infringement, the economic consequences it caused for both sides, and more. Because Delta is a U.S. company, Alaska respectfully seeks this Court's assistance in obtaining that evidence pursuant to 28 U.S.C. § 1782.

Section 1782 was enacted to facilitate discovery in the United States for use in foreign litigation. The statutory requirements are plainly met: Alaska is an

"interested person," seeking document production and deposition testimony from a business in this District, "for use" in a foreign proceeding. And the discretionary "*Intel*" factors that courts consider on Section 1782 applications all weigh in favor of granting the application and permitting the discovery too: Delta is a nonparty in the ongoing Breach Litigation in the United Kingdom, UK courts consistently approve the use of Section 1782 evidence, Alaska is not seeking to circumvent foreign discovery restrictions, and Alaska's requests are tailored and reasonable. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004).

## BACKGROUND

### A. The Launch of Virgin America

In 2004, and to great fanfare, Virgin Group announced plans to form a U.S airline—Virgin America. Miranda Decl. Ex. 10 ¶ 3. As part of that process, the newly formed Virgin America entered into a trademark license agreement with Virgin Group, which granted Virgin America the exclusive right to use certain Virgin trademarks for flights originating and terminating within the United States, Canada, Mexico, and the Caribbean. *Id.* ¶ 5.

In 2005, Virgin America applied to DOT for certification to operate a U.S. airline. Federal law requires that U.S. airlines be "owned" and under the "actual control" of U.S. citizens. 49 U.S.C. § 40102(a)(15), § 41102(a). In an effort to conform to that requirement, Virgin America proposed that U.S. investors would

control 75% of the airline, and Virgin Group entities (including two British Virgin executives) would control the remaining 25%.[1] But that was not enough. On December 27, 2006, DOT issued a negative show cause order in connection with Virgin America Inc.'s application for a certificate of public convenience and necessity, tentatively finding that Virgin America Inc. was neither owned nor controlled by U.S. citizens.[2] Specifically, DOT found that the TMLA, as then written, would "essentially prevent Virgin America from acting as an independent air carrier" and would "significantly restrict Virgin America's commercial-decision making authority."[3]

To demonstrate greater independence, Virgin America and Virgin Group proposed a revision to the TMLA that gave Virgin America more autonomy, but still required that it pay royalties regardless of whether it used the Virgin brand.[4] DOT rejected that proposal too because it still provided Virgin Group with too much control, and thus did not satisfy the stringent test for citizenship. DOT insisted that,

---

[1] *Virgin America Secures Funding*, L.A. Times (Dec. 9, 2025), https://www.latimes.com/archives/la-xpm-2005-dec-09-fi-virgin9-story.html; *see also* 49 U.S.C. § 40102(a)(15).

[2] *See* DOT, Order 2006-12-23, Application of Virgin America, Inc. for a Certificate of Public Convenience and Necessity Under 49 U.S.C. § 41102 to Engage in Interstate Schedules Air Transportation of Persons, Property, and Mail, 2006 WL 4504811 (D.O.T.) (Dec. 27, 2006).

[3] *Id.* at *16.

[4] *See* DOT, Order 2007-3-16, Application of Virgin America Inc. for a Certificate of Public Convenience and Necessity Under 49 U.S.C. § 41102 to Engage in Interstate Scheduled Air Transportation, 2007 WL 1280291 (D.O.T.), at *37 (Mar. 20, 2007) (quoting the proposed provision).

6

to operate in the United States, Virgin America needed to be able to stop paying royalties altogether if it stopped using the Virgin marks:

> Payment of "royalties" on revenues not derived from the use of the brand name would undermine the applicant's independence; therefore, we propose to condition the applicant's certificate on an amendment to the license that allows such activities to occur without royalty obligation.[5]

Following DOT's guidance, in April 2007 Virgin Group and Virgin America signed a revised TMLA, which appeared to give Virgin America the right to operate without using the Virgin marks and without paying royalties. Miranda Decl. Ex. 3 Clause 3.7. As Virgin America explained unambiguously in its DOT filing: "if [Virgin America] decides not to use the Name or Mark, the Company will not have to pay royalties." Miranda Decl. Ex. 10 ¶ 17 ("[T]he Company is not required to pay any royalties on any operations inside or outside of the territories, which do not involve the use of the Virgin Mark or Name."). On May 18, 2007, DOT issued a final order granting Virgin America a certificate of public convenience and necessity, permitting it to operate as a U.S. airline. *Id.* ¶ 18.

### B. The Partnership between Delta and Virgin Atlantic

Around the same time that Virgin America was entering the U.S. market, legacy carrier Delta was seeking to expand its trans-Atlantic presence. In

---

[5] *Id.* at *38. Delta also voiced concerns, agreeing with DOT that Virgin America was not a U.S. citizen under the proposed TMLA because Virgin America still had "intractable and pervasive foreign citizen ownership and control issues." *Id.* at *14.

December 2012, Delta struck a deal with Virgin Group's trans-Atlantic affiliate, Virgin Atlantic, under which Delta would acquire a 49% stake in Virgin Atlantic (Virgin Group owned the other 51%).[6] The two airlines formed a joint venture that included an agreement to provide reciprocal frequent flyer benefits.[7]

Several months later, Virgin Atlantic and Delta filed a DOT application for antitrust immunity.[8] And in June 2013, DOT (and the European Commission) approved Delta's acquisition of the 49% stake in Virgin Atlantic.[9] That same year, Delta announced that—in partnership with Virgin Atlantic—it would begin operating flights from Seattle-Tacoma International Airport to London Heathrow Airport.[10] And in April 2014, Delta announced that it was establishing its West Coast

---

[6] *Delta and Virgin Atlantic to Form Strategic Alliance*, Delta (Dec. 11, 2012), https://ir.delta.com/news/news-details/2012/Delta-and-Virgin-Atlantic-To-Form-Strategic-Alliance/default.aspx.

[7] *Id.*

[8] DOT Aviation Antitrust Immunity Cases, U.S. Dep't of Transp. (Mar. 27, 2024), https://www.transportation.gov/office-policy/aviation-policy/dot-aviation-antitrust-immunity-cases#Delta_Virgin_Atlantic. DOT granted the application in September 2013. *Id.*

[9] Gwyn Topham, *Delta cleared to complete purchase of 49% stake in Virgin Atlantic*, The Guardian (June 24, 2013), https://www.theguardian.com/business/2013/jun/24/delta-completes-purchase-virgin-atlantic-stake.

[10] *Delta Airlines and Virgin Atlantic Airways announce new summer schedule*, Delta (Nov. 11, 2013), https://ir.delta.com/news/news-details/2013/Delta-Air-Lines-and-Virgin-Atlantic-Airways-announce-new-summer-schedule/default.aspx. Delta also began operating flights from Seattle-Tacoma International Airport to Tokyo and Shanghai in 2013. *See* Edward Russell, *A history of Delta in Seattle, Alaska Airlines' hometown,* The Points Guy (Feb. 13, 2020), https://thepointsguy.com/news/history-of-delta-air-lines-seattle-alaska-hometown/.

hub in Seattle.[11] These moves were aimed at and contributed to an intense rivalry with Alaska, well-known as "Seattle's Hometown Airline." [12]

### C. The Virgin America IPO

As Delta's transatlantic business and new Seattle hub expanded, so too did Virgin America's domestic U.S. business. In July 2014, Virgin America presented plans for an Initial Public Offering ("IPO") to DOT. Miranda Decl. Ex. 10 ¶ 32. In connection with that plan, the parties amended the TMLA, including an extension to 2039. The TMLA was also amended to include a "Minimum Royalty" obligation, the purpose of which—Virgin America said—was to establish a floor for Virgin America's payments so long as they were using the marks. *Id.* ¶ 37. That obligation would kick in "if Virgin America's royalty payment from licensing fees would otherwise be less than that minimum payment." *Id.* In considering the proposal, DOT stated that the amendment to the TMLA did not disrupt the "no use, no royalty" right

---

[11] Russell, *supra* note 10.
[12]    *Alaska    Airlines    history*,    Alaska    Airlines    (last    accessed    July    3,    2025), https://www.alaskaair.com/content/about-us/history?srsltid=AfmBOopb80A3M3MyMLBn7PGT9Zqqm6prvrUI87vlVXNRn_G0R5Q1cgJl.

it had required when Virgin America first applied for a certificate to operate a U.S. airline:

> [T]he amended TMLA will continue to permit Virgin America the ability to operate independent of the "Virgin" names and marks without the obligation to pay royalties.

*Id.*

In October 2014, content with these amendments, DOT issued a letter finding that Virgin America would remain a U.S. citizen after its IPO. With that approval, the IPO took place on November 14, 2014. *Id.* ¶¶ 37–38. Five days later, Virgin Group and Virgin America executed the 2014 TMLA. Miranda Decl. Ex. 3 at 1. As in the 2007 version, the 2014 TMLA afforded Virgin America the exclusive right to use the Virgin mark on U.S. domestic flights (as well as certain other flights). Miranda Decl. Ex. 3 Clauses 3.2–3.3. The 2014 TMLA also retained the language from the 2007 agreement which Virgin America contended made clear that royalties would not be payable on revenues derived without use of the Virgin marks. *Id.* Clause 3.7.

### D. Alaska's Purchase of Virgin America

On December 14, 2016, Alaska acquired Virgin America for $2.6 billion in cash—closer to $4 billion including the assumption of debt and aircraft lease obligations. Miranda Decl. Ex. 10 ¶ 42.[13] That hefty purchase price represented an

---

[13] *See also* Brian Murphy & Renae Merle, *Alaska Air buys Virgin America in $4 billion deal*, Wash. Post (Apr. 4, 2016),

approximately 86 percent premium above Virgin America's then stock price, in recognition of the significant structural and network benefits that were expected to result—including providing Alaska, a growing airline with deep community roots and a commitment to quality and customer service, with access to Virgin's strong brand and loyal customer base.[14]

In approving the merger, the U.S. Department of Justice cited the pro-competitive nature of the transaction, recognizing that "[s]maller airlines, such as Alaska and Virgin [America], provide a critical competitive check on the larger carriers" (such as Delta) and the merger "offers hope that a strengthened Alaska can be an ever stronger competitor than before."[15] And Alaska likewise touted the benefits of integrating the two brands, noting on an earnings call that "the loyalty growth that's coming along with all of this" was "extremely positive."[16]

---

https://www.washingtonpost.com/news/business/wp/2016/04/04/alaska-air-buys-virgin-america-in-4-billion-deal/.

[14] *See* Jeffrey Dastin, *Alaska Air to buy Virgin America for $2.6 billion*, Reuters (Apr. 4, 2016), https://www.reuters.com/article/world/alaska-air-to-buy-virgin-america-for-26-billion-idUSKCN0X10VE/.

[15] Press Release, U.S. Department of Justice, Office of Public Affairs, Justice Department Requires Alaska Airlines to Significantly Scale Back Codeshare Agreement with American Airlines in Order to Proceed with Virgin America Acquisition (Dec. 6, 2016), https://www.justice.gov/opa/pr/justice-department-requires-alaska-airlines-significantly-scale-back-codeshare-agreement.

[16] Thomson Reuters, Preliminary Transcript: Q1 2017 Alaska Air Group Inc. Earnings Call, at 13 (Apr. 26, 2017), https://news.alaskaair.com/wp-content/uploads/2024/08/Transcript_ALK-US_20170426_5253378.pdf.

Following the acquisition, in late 2016, Alaska announced that it and Virgin America were, together, the fifth-largest airline in the U.S.,[17] though the combined airline was still dwarfed in size by established industry titan Delta. Indeed, while Alaska and Virgin America's combined fleet amounted to 286 aircrafts, Delta had a fleet of over 800.[18]

Less than a week after Alaska and Virgin America finalized the merger, Delta announced it would be terminating its longstanding partnership with Alaska, eliminating access to Delta's dominant domestic and international network for Alaska's customers. Next, Delta aggressively pursued Alaska's loyalty program members.[19] And Delta blanketed Alaska's routes in and out of Seattle, seemingly in an (unsuccessful) attempt to put Alaska out of business.[20] For example, Delta

---

[17] Alaska Air Group, Inc., *Alaska Air Group closes acquisition of Virgin America, becomes the 5th largest U.S. airline*, PR Newswire (Dec. 14, 2016), https://www.prnewswire.com/news-releases/alaska-air-group-closes-acquisition-of-virgin-america-becomes-the-5th-largest-us-airline-300378009.html.

[18] *Compare id.*, *with Delta Air Lines Announces December Quarter and Fully Year 2016 Profit*, Delta (Jan. 12, 2017), https://ir.delta.com/news/news-details/2017/Delta-Air-Lines-Announces-December-Quarter-and-Full-Year-2016-Profit/default.aspx. Delta's fleet still vastly outnumbers Alaska's. *Compare* Corporate Stats and Facts, *No One Better Connects the World*, Delta News Hub (last accessed July 3, 2025), https://news.delta.com/corporate-stats-and-facts (stating Delta has over 890 aircrafts), *with Fleet and Capacity,* Alaska Air Cargo (last accessed July 3, 2025), https://www.alaskacargo.com/fleet-and-capacity (stating Alaska has over 330 aircrafts).

[19] *See* JT Genter, *Delta and Alaska Airlines Are Breaking up Next Year*, The Points Guy (Dec. 19, 2016), https://thepointsguy.com/news/delta-alaska-breakup/.

[20] *See* Christine Burroni, *Alaska Airlines Exec on Competition with Delta, Possibility of Mileage Plan Change, and More*, Travel + Leisure (Jan. 8, 2025), https://www.travelandleisure.com/alaska-airlines-hawaiian-merger-lounges-credit-card-8770916 (noting that 55% of passenger seats out of Seattle are on Alaska flights); SEA Airport Basics, *About Seattle-Tacoma International Airport*, Port of Seattle (last accessed May 26, 2025), https://www.portseattle.org/page/sea-airport-basics (noting that 52.4% of passengers out of Seattle fly Alaska and 24.1% fly Delta).

expanded its "Delta Shuttle" service, introducing peak-day flights from Seattle-Tacoma International Airport to Los Angeles International Airport and San Francisco International Airport.[21] These moves only escalated the rivalry between Alaska and Delta.[22]

### E. Alaska's Integration of Virgin America

In 2017, Alaska announced its plan to merge Alaska and Virgin America into a single airline. As part of that merger, Alaska would stop using the Virgin America brand and consolidate marketing and operations under the Alaska name.[23]

Alaska continued to operate both brands for the next two years, as it expended considerable time and resources to transition brand-loyal Virgin customers to the Alaska family. By May 30, 2019, Alaska ceased using the Virgin marks entirely. Miranda Decl. Ex. 10 ¶ 45. Alaska informed Virgin Group at that stage that since it

---

[21] Delta Air Lines, *Delta Shuttle Takes Off From Seattle*, PR Newswire (May 9, 2016), https://www.prnewswire.com/news-releases/delta-shuttle-takes-off-from-seattle-300264752.html.

[22] *See, e.g.*, Alex Fitzpatrick, *Delta and Alaska Are at War Over Seattle*, Time (Nov. 19, 2015), https://time.com/4119983/alaska-airlines-delta-seattle/; Edward Russell, *Delta Air Lines drops 2 Alaska cities as turf battles persist with Alaska Airlines*, The Points Guy (Jan. 17, 2025), https://thepointsguy.com/news/delta-routes-alaska-battle/.

[23] Alaska Airlines, *Alaska and Virgin America: Creating an airline people love*, Alaska Airlines News Hub (Mar. 22, 2017), https://news.alaskaair.com/alaska-airlines/creating-an-airline-people-love/.

was not using the marks, it would stop paying royalties for their use. Miranda Decl. Ex. 9 ¶ 37(3).

Virgin Group then sued Alaska in the United Kingdom for unpaid royalties, taking the position that, even though Alaska had argued that DOT had conditioned Virgin America's very existence on the explicit "no use, no royalty" right, Alaska had to pay the minimum royalty whether or not it used the marks Miranda Decl. Ex. 10 ¶ 78. The UK court ruled for Virgin Group, *id.* ¶ 161, holding that the right to the exclusive use of the Virgin brand, which included the right to exclude others from using the Virgin brand, was a valuable right for which the minimum royalty was attributable. The UK appellate court upheld the decision. Miranda Decl. Ex. 6 ¶ 3.

### F. The Breach Litigation

In June 2022, Alaska discovered that, even as Virgin Group was trying to force Alaska to pay an annual royalty of ten million dollars for supposedly exclusive rights to the Virgin marks in the United States, Virgin Group's affiliates were infringing those very same rights. Specifically, Alaska learned that Virgin Atlantic was selling Delta-operated standalone domestic U.S. flights to "Flying Club" loyalty program members on its website. Miranda Decl. Ex. 9 ¶¶ 6–8; *see also* Miranda Decl. Ex. 5 ¶ 9. Members could purchase tickets on these domestic flights operated by Delta using Flying Club points earned by flying with Virgin Atlantic and certain partners, including Delta. Flying Club members could also transfer points earned

14

from non-airline loyalty programs, including Virgin Group's own Virgin Red loyalty program, and then use the transferred points to buy tickets on Delta planes. Flying Club members could also purchase points with cash and then use those points to buy the domestic Delta flights. In fact, for a while, Virgin Atlantic's own website asked customers: "Did you know you can fly from Boston to New York JFK for 7,500 Virgin Points with our partner Delta?"[24]

At the same time, Delta has continued to increase its presence in Alaska's hometown market, Seattle. Indeed, between 2014 and 2024, Delta's operations at Seattle shot up from under 19,000 flights per year to more than 54,000 flights per year.[25]

It would be bad enough to force Alaska to pay ten million dollars per year to Virgin Group for exclusive rights to marks it is not using. At least then, one could say, Alaska gets the benefit of ensuring that its competitors do not use the Virgin marks in the domestic United States to compete with Alaska. Indeed, Virgin Group made exactly that argument in trying to defend its minimum royalty position in the English Courts (notwithstanding its prior representations and assurances to DOT).

---

[24] *Delta Air Lines: Spend Your Virgin Points with Delta Airlines*, Virgin Atlantic (archived Jan. 11, 2024), https://web.archive.org/web/20240111190324/https://flywith.virginatlantic.com/gb/en/partner-airlines/skyteam/delta/delta-air-lines-spend-points.html.

[25] *Compare* Reports: SEA-TAC International Airport Total Landings by Airline, Port of Seattle (Dec. 2014), https://www.portseattle.org/page/airport-statistics, *with* Reports: SEA-TAC International Airport Total Landings by Airline, Port of Seattle (Dec. 2024), https://www.portseattle.org/page/airport-statistics.

But for Virgin Group and its affiliates to use those very same marks, in breach of the exclusivity agreement, to woo customers onto flights operated by Delta, Alaska's primary, aggressive, three-times-the-size, hometown competitor, is plainly unfair, unjust, and contrary to any plausible reading of the TMLA and applicable law.

Accordingly, in 2022, shortly after discovering the breach, Alaska sued Virgin Group in the United Kingdom, asserting that Virgin Group's conduct materially breached and interfered with Alaska's exclusive rights to use the Virgin marks, and thus terminated the TMLA. Miranda Decl. Ex. 9 ¶ 6, 8. Virgin Group filed a "strike out" application, arguing that even if there were a breach, the TMLA was not terminated on account of it. Miranda Decl. Ex. 5 ¶¶ 5–8, 10. Alaska disagrees, and a hearing is scheduled for September 16, 2025. Miranda Decl. ¶ 25. Whether or not the UK court denies the application (as Alaska believes it ought to), the case will go to trial as the evidential issues in relation to the scale and nature of the Delta Use will remain in issue. Miranda Decl. ¶¶ 26, 42. That ongoing litigation, soon to be in an evidentiary phase, gives rise to this Application.

### G. This Application

Delta is the 49% owner of Virgin Atlantic, the joint venture partner to Virgin Atlantic, and the operator of the U.S. flights that Virgin Atlantic sold using the Virgin marks, in breach of the TMLA. Accordingly, Delta is in possession of evidence that goes to the heart of the Breach Litigation—documents and

communications, for example, that show when the infringing sales first started, what efforts were made to shield them behind members-club login screens, how they harmed Alaska and benefited Virgin Atlantic and Delta, whether the Virgin-brand-loyal customers who bought those flights now continue to buy flights on Delta planes, and the extent to which, when the sales were made, Virgin Atlantic and Delta knew about the exclusive rights granted to Alaska under the TMLA, and decided to use the marks, sell the flights, and pocket the cash anyway. All of those questions speak to Virgin Group's breach of the TMLA, the materiality of that breach, and the ultimate damage to Alaska—all issues at the core of the Breach Litigation.

## ARGUMENT

Section 1782 authorizes district courts to facilitate discovery for use in foreign proceedings in circumstances just like these, where targeted requests can elicit relevant evidence from a U.S. non-party that will aid the ongoing proceedings. *See* 28 U.S.C. § 1782.

The statute itself imposes four express requirements: (1) the discovery target resides or is found within the district; (2) the request seeks testimonial or documentary evidence; (3) the discovery is "for use" before a foreign tribunal; and (4) the applicant is an "interested person." *In re Clerici*, 481 F.3d 1324, 1331–32 (11th Cir. 2007) (quoting 28 U.S.C. § 1782(a)). For the reasons set forth in Section I below, Alaska easily satisfies each here.

17

When the statutory requirements are met, the court considers four discretionary "*Intel*" factors: (1) whether the person or entity from whom discovery is sought is a "nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264–65. For the reasons set forth in Section II, each of these factors weighs in favor of granting Alaska's application.

## I.   ALASKA'S APPLICATION SATISFIES 28 U.S.C. § 1782'S STATUTORY REQUIREMENTS.

The four statutory requirements derived from the text of Section 1782 are readily satisfied here.

*First*, Delta "reside[s] or is found" in the Northern District of Georgia because Delta's principal place of business—the world's largest airline hub[26]—is here. *See* Quinn Decl. Ex. B. It is well-settled that this requirement is satisfied in those circumstances. *Gonzalaz v. Verfruco Foods, Inc.*, No. 21-12922, 2023 WL 1794391, at *1, 4 (11th Cir. Feb 7. 2023); *In re Application of Travessia Securitizadora de*

---

[26] *Delta at ATL: Bigger and Bolder at the World's Largest Airline Hub in Summer 2025*, Delta News Hub (Oct. 4, 2024), https://news.delta.com/delta-atl-bigger-and-bolder-worlds-largest-airline-hub-summer-2025.

18

*Créditos Financeiros X S.A.*, No. 23 Misc. 67, 2023 WL 12066604, at \*2 (N.D. Ga. Aug. 2, 2023); *In re Application of Compañía Anónima de Seguros la Occidental*, No. 15 Civ. 0012, 2015 WL 12862922, at \*3 (N.D. Ga. May 13, 2015).

*Second*, Alaska seeks "evidence in the form of document production and deposition testimony." *See Application of Consorcio Ecuatoriano de Telecommunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1269 (11th Cir. 2014). Indeed, Alaska's proposed subpoena seeks both from Delta. Quinn Decl. Ex. A.

*Third*, Alaska seeks discovery "for use in a proceeding in a foreign or international tribunal"—the Breach Litigation. 28 U.S.C. §1782(a). Indeed, evidence concerning the timing, scope, and impact of Virgin Atlantic's sale of flights operated by Alaska's chief competitor, Delta, go to the heart of that dispute, Miranda Decl. ¶ 42, but as a matter of law, even if all they did was provide "context," that would be sufficient. *See Weber v. Finker*, 554 F.3d 1379, 1385 (11th Cir. 2009).

*Fourth*, as the plaintiff in the Breach Litigation, Alaska is an "interested person" under Section 1782. Indeed, there is "[n]o doubt [that] litigants are included among, and may be the most common example of, the interested persons who may invoke § 1782." *Intel*, 542 U.S. at 256 (cleaned up); *see also In re Application of Travessia Securitizadora de Créditos Financeiros X S.A.*, 2023 WL 12066604, at \*2

19

("[Petitioner] is a litigant in the Brazil proceedings and, as such, it qualifies as an interested person.").

## II.    EACH DISCRETIONARY *INTEL* FACTOR SUPPORTS ALASKA'S APPLICATION.

Beyond the statutory text, the four discretionary *Intel* factors also weigh in favor of granting the Application.

*First*, Section 1782 discovery is appropriate when the target is not a party to the foreign proceeding and is beyond the jurisdiction and control of the foreign court. *Intel*, 542 U.S. at 264; *Clerici*, 481 F.3d at 1334–35. Here, Delta is not a party to the Breach Litigation, is incorporated in Delaware, and maintains its principal place of business in Georgia. Miranda Decl. ¶ 21; Quinn Decl. Ex. B. At the same time, Delta participated in, played a unique role with respect to, and benefited economically from the infringing conduct. In these circumstances, this Application is the right tool for obtaining the unique and relevant evidence in Delta's possession. Miranda Decl. ¶¶ 31–39.

*Second*, a Section 1782 application is more likely to be granted where the foreign tribunal will be receptive to the resulting evidence. This factor too plainly weighs in favor of granting Alaska's application—the Supreme Court in *Intel* noted that UK courts welcome Section 1782 evidence. *See Intel*, 542 U.S. at 262 (citing *S.C. Ins. Co. v. Assurantie Maatschappij "De Zeven Provincien" N.V.* [1987] AC 24 (HL) 42); *see also* Miranda Decl. ¶¶ 37–39. Accordingly, U.S. courts routinely

grant Section 1782 applications in support of UK proceedings and there is no reason for this Court to break ranks. *See, e.g.*, *In re Man Grp. Ltd.*, No. 24 Misc. 559, 2025 WL 294277, at *1 (S.D.N.Y. Jan. 24, 2025) (granting Section 1782 application for UK proceeding); *In re England/Bahamas*, No. 20 Misc. 61696, 2021 WL 3270074, at *6 n.13 (S.D. Fla. July 30, 2021) ("Case law suggests that . . . England . . . [is] receptive to § 1782 discovery, including deposition testimony"); *In re Novoship (UK) Ltd.*, No. 20 Misc. 60876, 2020 WL 3286308, at *3 (S.D. Fla. June 18, 2020) ("§ 1782 is routinely used to obtain evidence for proceedings in" the United Kingdom).

*Third*, an application under Section 1782 may be denied where it "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. This is a high bar. This factor does not impose an exhaustion requirement, or even express a preference for party discovery first and foreign non-party discovery second. Indeed, the Eleventh Circuit has been clear that, "even when the requested documents may be available in the foreign jurisdiction, there is no requirement to first seek discovery from the non-US tribunal or exhaust other options before applying to a district court for § 1782 discovery." *In re Application of Bracha Found.*, 663 F. App'x 755, 765 (11th Cir. 2016). Instead, if an application is to be denied based on this third discretionary factor, courts in the Eleventh Circuit look for some "ruse" or "chicanery." *Glock v.*

*Glock, Inc.*, 797 F.3d 1002, 1009 (11th Cir. 2015); *see also El Poder del Consumidor v. Coca-Cola Co.*, No. 24 Civ. 03665, 2024 WL 5089428, at *6 (N.D. Ga. Oct. 30, 2024), *report and recommendation adopted*, 2025 WL 548273 (Feb. 19, 2025). Nothing of the sort could be argued here—Alaska propounds targeted requests in good faith seeking key evidence, from a key non-party that participated in and benefited from the infringing conduct, that is plainly material to the ongoing Breach Litigation. Miranda Decl. ¶¶ 41–42.

*Fourth*, a Section 1782 application may be denied if it is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. The Eleventh Circuit has made clear that this too is a high bar: because Section 1782 expressly "directs judges to provide discovery assistance pursuant to the Federal Rules of Civil Procedure," *Weber v. Finker*, 554 F.3d 1379, 1384 (11th Cir. 2009), "the § 1782(a) applicant may seek discovery of any nonprivileged matter that is relevant to any party's claim or defense," *In re O'Keeffe*, 660 F. App'x 871, 873 (11th Cir. 2016). As a result, to deny an application on this basis, courts would need to see an "improper 'fishing expedition' based entirely on speculation." *In re O'Keeffe*, 660 F. App'x at 873. Here, by contrast, Alaska's requests are "sufficiently limited in scope and narrowly tailored." *In re Sociedad Militar Seguro de Vida*, 985 F. Supp. 2d 1375, 1380 (N.D. Ga. 2013). Indeed, each of the requests is aimed at a category of evidence directly linked to the fact questions at issue in the Breach Litigation. Miranda Decl. ¶¶ 41–

42. Thus, the document requests in the Subpoena seek agreements and related communications between Delta and various Virgin entities concerning revenue-sharing and marketing of the infringing flights (Ex. A Sched. B Requests 1–4, 6–7); the value of the Virgin brand in the United States (Request 5); the scope, scale, and revenue associated with the infringing flights (Requests 8–11); and the extent to which the sale of those flights knowingly infringed Alaska's rights under the TMLA (Request 12). To the extent Delta objects to a portion of some request, or seeks confidentiality protection or use restrictions pursuant to a protective order, all of that is appropriately handled, at least in the first instance, through the meet-and-confer process. *See In re Application of Travessia Securitizadora de Créditos Financeiros X S.A.*, 2023 WL 12066604, at *1, 3 (granting request for "documents and deposition testimony" and noting that the target may, at a later date, "object to any component of the discovery encompassed within the subpoena"); *see also In re Sociedad Militar Seguro de Vida*, 985 F. Supp. 2d 1375 at 1381.

In sum, all the discretionary factors weigh in favor of granting Alaska's application, which seeks relevant and important evidence, from a non-party participant in infringing conduct, in order to prove the material breach that harmed Alaska and helped its competitors, and to put an end to Virgin Group's scheme to defy U.S. regulators and run away from its own contractual agreements.

23

## CONCLUSION

For the foregoing reasons, Alaska's Application should be granted.

Dated: July 9, 2025

/s/ Aaron M. Danzig

Aaron M. Danzig
Georgia Bar. No. 205151
Arnall Golden Gregory LLP
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363
(404) 873-8504
aaron.danzig@agg.com

Sean Hecker*
John C. Quinn*
Hecker Fink LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
shecker@heckerfink.com
jquinn@heckerfink.com

Katherine Epstein*
Hecker Fink LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
(202) 742-2661
kepstein@heckerfink.com

*Counsel for Petitioner Alaska Airlines, Inc.*

*Pro Hac Vice forthcoming*

25

## CERTIFICATE OF COMPLIANCE

Pursuant to Civil Local Rule 7.1(d), I hereby certify that this brief complies with the typeface requirements of Civil Local Rule 5.1(B) because it has been prepared using Microsoft Word in a 14-point Times New Roman font.


Dated: July 9, 2025

/s/ Aaron M. Danzig
_____
Aaron M. Danzig
Arnall Golden Gregory LLP

*Counsel for Petitioner Alaska Airlines, Inc.*